# UNITED STATES DISTRICT COURT

for the
**EASTERN DISTRICT OF WISCONSIN**

In the Matter of the Seizure of

        *(Address or brief description of property or premises to be seized)*

ALL USDC HELD ON DEPOSIT IN ETHEREUM BLOCKCHAIN      Case Number: 24-903M(NJ)
ADDRESS 0x500e9b90b1310b8dcf3f82e03344e0da79694857

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

**TO:**      **BRIAN WALLANDER, a Task Force Agent with the United States Secret Service, and any Authorized Officer of the United States**.

An application by a federal law enforcement officer or an attorney for the government requests that certain property be seized as being subject to forfeiture to the United States of America. The property is described as follows:

All USDC held on deposit in Ethereum Blockchain address 0x500e9b90b1310b8dcf3f82e03344e0da79694857

I find that the affidavit and any recorded testimony establish probable cause to seize the property.

     **YOU ARE HEREBY COMMANDED** to search on or before <u>September 26              , 2024</u>
                                                                     *(not to exceed 14 days)*

         ❑ in the daytime – 6:00 a.m. to 10:00 p.m.      ❑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge Nancy Joseph.

         ❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. §2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person, who, or whose property, will be searched or seized *(check the appropriate box)*      ❑ for \_\_\_\_\_ days. *(not to exceed 30)*
                         ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued <u>9/12    , 2024;</u> ❑ 3:10 p.m.                                     
                                                            *Judge's signature*

City and state: <u>Milwaukee, Wisconsin</u>          <u>THE HONORABLE NANCY JOSEPH</u>
                                                 <u>United States Magistrate Judge</u>
                                                 *Name & Title of Judicial Officer*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ALL USDC HELD ON DEPOSIT IN ETHEREUM BLOCKCHAIN        Case Number: 24-903M(NJ)
ADDRESS 0x500e9b90b1310b8dcf3f82e03344e0da79694857

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Brian Wallander, being duly sworn depose and say:

I am a Task Force Agent with the United States Secret Service and have reason to believe that in the District of Massachusetts there is now certain property, namely, all USDC held on deposit in Ethereum Blockchain address 0x500e9b90b1310b8dcf3f82e03344e0da79694857, that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) in conjunction with 28 U.S.C. § 2461(c), as (1) funds traceable to, and therefore proceeds of, specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343; and (2) funds involved in, or traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.
❏ Delayed notice of ____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Brian Wallander*
Signature of Affiant
Brian Wallander, USSS

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

Date and time
issued: 9/12/2024 @
3:10 p.m.

at Milwaukee, Wisconsin
City and State

Nancy Joseph, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEIZURE WARRANT**

I, Brian Wallander, being first duly sworn, hereby depose and state as follows:

<u>**FUNDS TO BE SEIZED**</u>

1.      I submit this affidavit in support of an application for a warrant to seize all **USDC on deposit in Ethereum Blockchain address 0x500e9b90b1310b8dcf3f82e03344e0da79694857 ("Subject Account").**

2.      For the reasons set forth below, I submit that probable cause exists to believe that all USDC held **on deposit in Ethereum Blockchain address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** are:

   a.      Funds traceable to, and are therefore proceeds of, a wire fraud offense or offenses committed in violation of 18 U.S.C. § 1343, and therefore subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

   b.      Funds involved in, or traceable to funds involved in, money laundering offenses, committed in violation of 18 U.S.C. §§ 1956 and 1957, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981 (a)(1)(A) and 984, and subject to criminal forfeiture under 18 U.S.C. § 982(a)(1); and

   c.      Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

<u>**BACKGROUND AND EXPERIENCE**</u>

3.      I am a Detective with the City of Greenfield Police Department and have been employed with that department since 1996.  I am currently assigned to the United States Secret Service Milwaukee Resident Office Financial Crimes Task Force ("MFCTF").

1

I was federally deputized in December of 2015. My duties as a Detective and Task Force Agent with the Secret Service include investigating financial crimes, such as identity fraud, check fraud, credit card fraud, bank fraud, wire fraud, currency-counterfeiting offenses, and money laundering.

4. As a Detective and Task Force Agent, I have conducted investigations into wire fraud, money laundering, and other complex financial crimes. In the course of those investigations, I have used various investigative techniques, including conducting undercover operations, reviewing physical and electronic evidence, obtaining and reviewing financial records, and working with cooperating sources of information. In the course of those investigations, I have also become familiar with techniques that criminals use to conceal the nature, source, location, ownership, and control of proceeds of crime and to avoid detection by law enforcement of their underlying acts and money laundering activities.

5. During my tenure as a law enforcement officer, I have been involved in the investigation of wire fraud and multiple variations of online computer fraud in Milwaukee County, in the State of Wisconsin, across the United States, and internationally. I have received training in the investigation of wire fraud, money laundering, and computer crimes. My training and experience include the following:

   a. I am a member of the International Association of Financial Crime Investigators (IAFCI) and have received formal training in the use of cryptocurrencies by persons involved in fraud and have a basic understanding of how cryptocurrencies work.

   b. I know that persons involved in wire fraud and internet scams often attempt to protect and conceal proceeds through money laundering,

2

including but not limited to domestic and international banks, securities brokers, service professionals, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses that generate large quantities of currency. I know that it is common for online fraudsters to obtain, secrete, transfer, conceal, or spend fraud proceeds using digital currency, also known as cryptocurrency.

c.    Digital currency is generally defined as an electronic sourced unit of value, which can substitute for fiat currency. Digital currency exists entirely on the Internet and is not stored in any physical form. Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.

d.    Bitcoin is one type of digital currency. Bitcoin payments are recorded in a public ledger maintained by peer-to-peer verification and is, therefore, not maintained by a single administrator or entity. Individuals can acquire bitcoins either by "mining" or by purchasing Bitcoins from other individuals. An individual can "mine" for Bitcoins by allowing his computing power to verify and record the bitcoin payments into a public ledger. Individuals are rewarded for this by receiving newly-created Bitcoins. An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be performed on any type of computer.

e.    Bitcoins are stored on digital "wallets." A digital wallet essentially stores the access code that allows an individual to conduct bitcoin transactions on the public ledger. To access bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address is similar to an account number while the private key is similar to an account password. Even though the public addresses of transactors are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, an investigator could determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," or partially anonymous.

f.    An exchange cryptocurrency account has multiple "wallets," sub-accounts, or sub-wallets for holding different currency (e.g., U.S.

dollars, Bitcoin, Dogecoin, TetherUS, Bitcoin Cash, Bitcoin Gold), but all of the sub-wallets are within one account. The funds can be readily moved from one currency to another currency within the same account. The value of the cryptocurrency relative to the U.S. dollar is constantly changing so the exact value is unknown until the funds are transferred out. Many Bitcoin companies allow the account holder to control the "key" for each wallet and that "key" is needed to transfer or remove funds. However, exchanges control the "key" to each of the wallets on its platform.

g.   Online fraudsters often use enhanced cryptocurrency, such as Bitcoin, to protect their identities, launder money, and conceal drug proceeds, because of the anonymity provided by cryptocurrency. Bitcoin is a decentralized digital currency without a central bank or single administrator. Payments are sent from user-to-user on the peer-to-peer bitcoin network without the need for intermediaries. These services add layers of anonymity to financial transactions to evade law enforcement.

h.   I know that persons involved in online fraud often use cryptocurrencies as a way of moving stolen funds very rapidly through electronic transfers into various crypto wallets. I know that cryptocurrencies are generally not backed by any government entity and that cryptocurrency is an international form of payment accepted throughout the world in the same format. For this reason, fraudsters can move large amounts of stolen funds internationally very rapidly in a digital universal format. Once the stolen funds are moved, commingled with other funds, and concealed, those funds can then be transferred to other forms of cryptocurrency or into fiat currency making it challenging for law enforcement to trace.

6.   This affidavit is based upon my personal knowledge and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, I refer to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

7.      This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      I submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after a restraining order or similar process has been issued to financial institution, the funds sought to be restrained were not effectively restrained by the financial institution.  In my judgment, a seizure warrant would be the most effective way to assure the availability of the money sought to be seized for forfeiture by the accompanying seizure warrant.

## CRYPTOCURRENCY DEFINITIONS

9.      **"Blockchain"** means an electronic record created by the use of a decentralized method by multiple parties to verify and store a digital record of transactions which is secured by the use of a cryptographic hash of previous transaction information.

10.     **"Crytpograhpic or transaction hash"** means a mathematical algorithm which performs a one-way conversion of input data into output data of a specified size to verify the integrity of the data.

11.     **"Electronic"** means relating to technology having electrical, digital, magnetic, wireless, optical, electromagnetic, or similar capabilities.

12.      **"Electronic record"** means a record created, generated, sent, communicated, received, or stored by electronic means, including a blockchain or a smart contract.

13.      **"Record"** means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

14.      **"Smart contract"** means a contract stored as an electronic record which is verified by the use of a blockchain.

15.      **"Circle"** is a corporation that produces and issues USDC and EURC coin. USDC is defined as a stablecoin and is backed by a variety of reserves to support the USDC in circulation. Circle maintains a value of 1:1 with the U.S. Dollar. Circle also maintains the EURC for the Euro and the Mint, where a consumer can convert local currency to USDC or EURC.

16.      **"Cryptocurrency"** means a type of virtual currency, generally in a decentralized, peer-to-peer network medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services, or exchanged for fiat currency or other cryptocurrencies. Individuals can obtain cryptocurrency through exchanges and other intermediaries, person-to-person transfers, the sale of goods or services, or mining. There are thousands of cryptocurrencies including Bitcoin ("BTC"), Ether ("ETH"), Tether ("USDT"), and USD Coin (USDC).

17.      **"Cryptocurrency exchange"** means a business that allows customers to trade cryptocurrencies or digital currencies for other assets, such as conventional fiat money or other digital currencies. Exchanges may accept credit card payments, wire

6

transfers or other forms of payments in exchange for digital currencies or cryptocurrencies.

18.     **"Fiat currency"** means coin and paper money of a country that has legal tender.

19.     **"Blockchain analysis"** means the process of inspecting, identifying, clustering, modeling and visually representing data on a cryptographic, distributed-ledger known as a Blockchain. Data in most Blockchains is public, meaning anyone can view the contents. The goal of Blockchain analysis is discovering useful information about the different actors transacting in cryptocurrency by using open source and/or subscription analytical tools, such as "Chainalysis" to determine what transactions were conducted by that individual or entity. Cryptocurrency transactions are sometimes referred to a "pseudonymous", meaning that they are partially anonymous.

20.     **"Wallet"** means a software program that interfaces with the Blockchain and generates and stores public and private keys used to send and receive cryptocurrencies. A wallet can have one or more cryptocurrency address(es) that are controlled by the same individual or entity.

- **Custodial Wallet**: Also known as hosted – where the wallet provider, as opposed to the owner of the cryptocurrency, keeps custody of the public and private keys on the wallet owner's behalf.
- **Non-Custodial Wallet**: Also known as un-hosted, self-hosted, or cold wallet – where the wallet owner has sole access to the private keys which are stored offline.

21.     **"Cryptocurrency Address"** means a public address, which is represented as a case-sensitive string of letters and numbers, is akin to a bank account number, and a private key is a cryptographic equivalent of a Personal Identification Number (PIN) or password. Although cryptocurrencies such as Bitcoin, Ether, and Tether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is often used as payment for illegal goods and services. By maintaining multiple address and/or wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

22.     **"Private Key"** is the cryptographic equivalent of a Personal Identification Number (PIN) or password. To access and transfer value associated with a public key or address on a Blockchain, an individual must use the public key or address and its unique corresponding private key. The value lies in the private key because whoever controls the private key controls any value associated with the corresponding cryptocurrency public address. While private keys are initially generated by a user's wallet software, they can be copied and stored in various locations.

### BACKGROUND ON CRYPTOCURRENCY & TRANSACTION ANALYSIS

23.     Bitcoin, for example, is a type of cryptocurrency circulated over the Internet. Bitcoin is not issued by any government, bank, or company, but rather is controlled through computer software operating via a decentralized, peer-to-peer network.

24.     Bitcoin can be exchanged directly, person to person, through a cryptocurrency exchange, or through other intermediaries. Bitcoin is sent and received

8

from Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled through the use of a unique corresponding private key. This key is the cryptographic equivalent of a password or PIN and is necessary to access the Bitcoin address. Only the holder of an address' private key can authorize any transfers of Bitcoin from that address to other Bitcoin addresses. The individual or entity who holds the private key for a Bitcoin address is, therefore, considered the "owner" of the address. Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin address for each and every transaction. Users often combine multiple Bitcoin addresses (and their corresponding private keys) in a single logical unit known as a Bitcoin "wallet."

25. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is often used by individuals and organizations for criminal purposes such as money laundering. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track proceeds of illicit activities. Although it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

26. While a Bitcoin address itself does not generally reveal the address' owner (unless the owner opts to make information about the owner's Bitcoin address publicly available), the Bitcoin Blockchain is an open, distributed ledger that records transactions of Bitcoin between two addresses efficiently and in a verifiable and permanent way.

Investigators can sometimes use the Blockchain to identify the owner of a particular Bitcoin address or identify Bitcoin addresses that likely all belong to the same owner. For example, because the Blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to other Bitcoin addresses, including cryptocurrency exchanges and Bitcoin payment processors.

27. Investigators may cluster Bitcoin addresses believed to be held by the same owner for the purposes of Blockchain analysis into a single "merge wallet." Two ways that analysts determine that multiple addresses are likely under the control of the same owner are called "co-spending" and "change address analysis." "Co-spending" is when a number of Bitcoin addresses are all used to send bitcoin in a single transaction. This indicates that a single owner holds the private keys for all those addresses. "Change address analysis" identifies addresses operating as "change addresses" for a particular account owner. Each Bitcoin transaction requires that all the Bitcoin at a given address be sent to new addresses. If the owner of the Bitcoin wants to spend less than the complete amount of Bitcoin held at one of their addresses, they send the excess Bitcoin to a new address for which they also hold the private key, called a "change address." Change addresses are therefore likely held by the same owner as the original Bitcoin address.

28. Investigators may utilize blockchain analytics tools while tracing cryptocurrency. The analytics tools utilize the blockchain as the foundation of their software, leveraging intelligence and factors like "co-spending" to create clusters. All tracing conducted using blockchain analytics tools is independently verified using open-

10

source wallet explorers that are available on the internet. The wallet explorers only show data as seen on the blockchain and do not include any analytical features.

## BACKGROUND ON CIRCLE

29.     Circle Internet Financial, LLC "Circle" is licensed as a Money Transmitter by New York State, Department of Financial Institutions. Circle is listed in the National Multistate Licensing System (NMLS) License #1201441. Circle is listed at the address, 99 High St, Suite 1701, Boston, MA 02110. Circle is licensed by the New York State Department of Financial Services as a Money Transmitter.

30.     Circle is the sole issuer of USDC and can blocklist, meaning to freeze and make inactive, on multiple blockchains.

## PROBABLE CAUSE

31.     On September 1, 2024, Officer Kevon Williamson, a police officer with the Oak Creek Police Department, in Milwaukee County, State of Wisconsin, United States of America responded to 725 E. Marshall Avenue, City of Oak Creek, Milwaukee County, Eastern District of Wisconsin, to take a fraud complaint.  Officer Kevon Williamson spoke with victim, "S.M."  S.M. told Officer Williamson that he was scammed and tricked into converting $550,000 USD to USDC (a cryptocurrency stable coin that is pegged to the United States dollar) and then sending it to the following virtual currency address: 0x794044e4f48bf40659041db869f5041772615956.

32.     On September 10, 2024, Detective Benjamin Lockwood, a police detective with the Oak Creek Police Department, was asked to follow up on the case.  Detective

Lockwood met with victim, S.M., in Oak Creek, Wisconsin to get some information regarding the scam.

33.     Victim S.M. told Detective Lockwood that back in May of 2024, he found an ad on Facebook, labeled something similar to "Millionaire Boot Camp." He join this group and was directed to communicate through Whatsapp and Telegram. Detective Lockwood knows that Whatsapp is an instant messaging and voice-over-IP messaging program. Telegram is a cloud-based, cross-platform, social media and instant messaging service program. Detective Lockwood understands that often fraudsters and scammers will use Whatsapp and Telegram to communicate with victims because both programs advertise having end-to-end encryption making it difficult for law enforcement to get information from the companies.

34.     Victim S.M. told Detective Lockwood that once in the "Millionaire Boot Camp" group, they advertised the program as trading secrets, knowledge and advice on how to trade cryptocurrencies and the stock market. S.M. said that the main "professor" had a Telegram username of "John Harrison." John Harrison sounded to S.M. as an expert and provide tips and tricks that were used within S.M.'s own investment accounts with Charles Schwab. S.M. said that these tips proved to be reliable because S.M. did make some money within his own accounts. After seeing his Charles Schwab investment accounts increase he said that he believed and trusted "John Harrison."

35.     Victim S.M. said that "John Harrison" then employed another telegram user to communicate with S.M. He indicated the Telegram user name was Mia Davis (@mia_davis7). "John Harrison" and "Mia Davis" convinced S.M. that they had a reliable

12

and trustworthy lead into making millions of dollars within the cryptocurrency market. S.M. said that they taught him what an IDO (initial DEX Offering) was and how they are capable of making people millionaires by getting in at the ground level of new cryptocurrencies. In order to take advantage of a specific IDO called clfcoin S.M. was convinced to sign up for an account through the clfcoin website/exchange.

36.     In June of 2024, S.M. signed up for an account through clfcoin using a website provided by "John Harrison" and "Mia Davis." The website is as follows: h5.clfcoin.com. After S.M. signed up for this website, "John Harrison" and "Mia Davis" taught S.M. how to send US Dollars to S.M.'s Coinbase account. S.M. was than instructed by "John Harrison" and "Mia Davis" to convert the USD to USDC (a cryptocurrency stable coin that is pegged to the United States dollar).

37.     On June 8, 2024, S.M. was instructed to send the USDC from his Coinbase account      to      a      specific      virtual      currency      address: 0x794044e4f48bf40659041db869f5041772615956.      S.M. was led to believe by "John Harrison" and "Mia Davis" that this virtual currency address was funding his cflcoin account. S.M. first sent small amounts on June 8, 2024: ($58 and $12) until he saw these funds enter his account balance on the cflcoin account. S.M. told Detective Lockwood that after sending money from Coinbase to the above address he would have to show "John Harrison" or "Mia Davis" a transaction receipt from Coinbase and only after that, did he see his clfcoin account get funded.

38.     S.M. told Detective Lockwood that after the small amounts sent from his Coinbase account entered his clfcoin account, he believed that he had control over this

13

money.  S.M. than sent larger amounts so that he could start trading on the Clfcoin exchange account.  On June 8, 2024 and through June 17, 2024, S.M. sent the following amounts of USDC to 0x794044e4f48bf40659041db869f5041772615956: $5,902.73, $5,025.48, $49,990 and $99,990.42.

39.     S.M. told Detective Lockwood that with his account now funded he started trading at the direction of "John Harrison" and "Mia Davis."  Shortly after depositing USDC to his clfcoin account he was able to double his money with the advice from "John Harrison" and "Mia Davis."  This made him more confident that he had control over the money in that account and that the information he was getting was valid.  On or near June 18, 2024, S.M. said that he was "wiped out," meaning that the trades he made were unsuccessful and he lost all of his USDC that he initially invested.  He stated that he trusted "John Harrison" and "Mia Davis" because their strategies worked in the past, so he deposited more money from his Coinbase account into the Cflcoin account.

40.     From June 26, 2024 until July 16, 2024, S.M. sent the following amounts of USDC valued in USD from his Coinbase account to virtual currency address 0x794044e4f48bf40659041db869f5041772615956:   $40,990.00,   $49,090.00,   $37,730.00, $4,987.78, $28,792.21, $41,056.50).  Again, S.M. saw his cflcoin account get funded for each transaction only after he showed a Coinbase transaction to "John Harrison" or "Mia Davis."  Around July 17, 2024, S.M. said that his cflcoin trading account again went to zero but he was convinced at this point that he was able to make the money back.  He was convinced again by "John Harrison" and "Mia Davis" to deposit more USDC into his cflcoin account.

41.     From July 22, 2024 until August 19, 2024, S.M. sent the following amounts of USDC valued in USD from his Coinbase account to virtual currency address 0x794044e4f48bf40659041db869f5041772615956:  ($25,090.00,  $80,090.00,  $21,140.00, $60,090.01, $1,510.00).  S.M. than started to trade these amounts on the cflcoin account and accumulated roughly $14,000,000.00 in profits.  He halted his trades and than attempted to withdraw the amount to his Coinbase account.  S.M. said that he was unable to make withdrawals.

42.     S.M. told Detective Lockwood that he consulted with "Mia Davis" and "John Harrison" that he was unable to withdraw his funds.  "Mia Davis" and "John Harrison" then told S.M. that in order to withdraw his funds they needed to be paid a "tax" or a "fee."  S.M. said that they instructed him to deposit more money in order to withdraw.  This is when S.M. became suspicious and started to research Cflcoin on the internet.  S.M. told Detective Lockwood that he found multiple online resources that indicated the cflcoin website was a fake and that the funds inside that website were a fraud.

43.     Detective Lockwood knows from previous cases and general knowledge that often fraudsters and scammers will create a fake website and give the illusion to the victim that they have control over their own funds.  The fraudsters and scammers will provide a virtual currency address to the victim to fund their "fake" trading account.  In this case the fraudsters provided S.M. the virtual currency address of 0x794044e4f48bf40659041db869f5041772615956.  Each time S.M. sent the funds to that address, unbeknownst to S.M., the money was immediately transferred to different

15

accounts belonging to the suspect(s). The suspect(s) then requested a transaction receipt to see the amount to fund S.M.'s fake cflcoin account that same amount. This gave S.M. the illusion that he still had control of his money even though the money was already being transferred to different accounts owned and operated by the suspect(s).

44. Case agents know that fraudsters and scammers will create these fake trading accounts to convince the victims they have control of their money and to persuade them into depositing more money as time goes on.

45. Detective Scott Simons from the Greenfield Police Department, Milwaukee County, State of Wisconsin was provided the transaction details related to S.M.'s transactions from Coinbase to virtual currency address 0x794044e4f48bf40659041db869f5041772615956. Detective Scott Simons determined based in part on Blockchain analysis that the funds from each and every transaction were sent to virtual currency **address 0x500e9b90b1310b8dcf3f82e03344e0da79694857 ("Subject Account")**.

## CRYPTOCURRENCY TRACING – BLOCKCHAIN ANALYSIS

46. On September 10, 2024, case agents (Greenfield Police Detective Scott Simons and Oak Creek Police Detective Benjamin Lockwood) conducted blockchain analysis of the victim transactions. Det. Simons has been employed as a law enforcement officer with the State of Wisconsin for 22 years. Det. Simons was a federally deputized task force officer with the Drug Enforcement Administration from 2013 to 2023 working transnational drug trafficking and money laundering organizations throughout dozens of countries resulting in the seizure of illicit proceeds in excess of $20 million, to include

16

millions of dollars worth of cryptocurrency. Det. Simons has received hundreds of hours worth of cryptocurrency training and has trained federal, state, local, and foreign law enforcement in cryptocurrency and cyber investigations. Det. Simons is currently assigned to the Midwest Cryptocurrency Task Force and a team leader with Operation Shamrock, which is a public and private sector aimed at investigating and assisting victims involved with cryptocurrency related fraud. Case agents used multiple tools to trace the stolen cryptocurrency funds. Case agents have found these tools to be reliable in the past, and all work was verified.

47.     Case agents reviewed records provided by the victim showing seventeen (17) transactions were sent, as directed by the target(s) of the investigation. The first two transactions were small test transactions, resulting in fifteen (15) significant transactions made by the victim. These fifteen (15) transactions consisted of the cryptocurrency token USD Coin (USDC) valued at approximately $551,000 USD. Case agents knows that USDC and USDT are Stable coins. Although most cryptocurrency is decentralized, meaning it is not backed by a government or entity, Stable coins are backed by an asset, which helps the Stable coin hold a consistent value. USDC and USDT are pegged to the U.S. Dollar at a 1:1 ratio.

48.     All 15 transactions were made between June 8, 2024 through August 19, 2024 and sent to Ethereum Blockchain address 0x794044e4f48bf40659041db869f5041772615956. All the funds were sent as USDC. The victim believed the USDC was being sent to the target of the investigation for the purpose of investing.

49.     Between June 9, 2024 and August 25, 2024, 10 transactions were sent by the target out of address 0x794044e4f48bf40659041db869f5041772615956.  A portion of the victim's USDC, or 413,797.06 USDC, was sent in 7 transactions to address 0x41771b43fdad27a9daaf8f3c1865b3c7c107f32c. Another quantity of the victim's USDC (28,791.15 USDC) was sent out of address 0x794044e4f48bf40659041db869f5041772615956 to address 0x516e20803401701b60df583226bf52e9426eda32, and another quantity of the victim's USDC (42,714.16 USDC and 66,141.60 USDC) was sent to address 0xf832388a73de04f2ce473251807e2e6b2c0c930e. *See* Figure 1.

50.     Between June 24, 2024 and September 5, 2024, 413,797.01 USDC was sent from address 0x41771b43fdad27a9daaf8f3c1865b3c7c107f32c, comprised of 3 separate transactions, to **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**.  The victim's USDC in these 3 transactions was commingled with other funds (total commingled amount was 708,032 USDC).  The victim's USDC deposited into address 0xf832388a73de04f2ce473251807e2e6b2c0c930e as 2 transactions (combined total was 108,855.7716 USDC) and also sent to **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**.  Finally, the victim's 28,791.158569 USDC deposited into address 0x516e20803401701b60df583226bf52e9426eda32 as 1 deposit, was commingled with other unrelated USDC (total commingled amount was 420,683 USDC) and sent to **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**. *See* Figure 1.

18



*Figure 1*

51.     On July 1, 2024, an amount of 370,000 USDC on deposit in the **subject account**, containing approximately 160,896.46 USDC from the victim, was swapped from USDC to another stable coin, Tether (USDT).   The 370,000 USDT was immediately returned after the coin swap to the **subject account address** **0x500e9b90b1310b8dcf3f82e03344e0da79694857**.

52.     Case agents know cryptocurrency is often times used for money laundering.   In this investigation, all of the victim's funds were sent from Coinbase and could have been sent directly to the **subject account address** **0x500e9b90b1310b8dcf3f82e03344e0da79694857.**     Instead, the target(s) of the

19

investigation directed the victim to send the funds to a particular address held by the target. The target(s) decided to send quantities of the victim's funds through three different paths. Sometimes the funds were commingled with other funds stolen from the victim while other times the stolen funds were commingled with funds not stolen directly from this reporting victim (S.M.). Case agents know that using multiple addresses, splitting the funds up, and commingling stolen funds with other funds is done to obfuscate the origin of funds and make it more difficult for case agents to follow. Furthermore, the target(s) also swapped some of the victim's USDC into USDT and kept the USDT on deposit in the **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857.** Case agents know this is a another common method to disguise the origin of funds and make it more difficult for case agents to follow it.

53.     Case agents determined that all of the victim's USDC worth approximately $551,000 was deposited into **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**. As of September 11, 2024, all of the victim's USDC and USDT remain on deposit in **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**.

54.     Case agents know that co-conspirators of fraudulent investment scams and money launderers often times prefer to use cryptocurrency due to less regulation by authorities and the difficulty of authorities to seize cryptocurrency. The **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** is a noncustodial unhosted wallet, which means the user only has control of the private key. Only the possessor of

20

the private key can typically take custody of cryptocurrency. Most cryptocurrencies are decentralized and not backed by a government or other entities. Stable coins such as USDC and USDT are a centralized cryptocurrency meaning they are backed by an asset. One USDC or one USDT holds a consistent value of 1:1 with the U.S. Dollar. USDC is a stable coin created by and controlled by Circle and USDT is a stable coin created by and controlled by Tether. Circle can blocklist (freeze) all USDC in an address making it have no value. Circle can then reissue the value of the USDC on deposit to a government controlled account. Case agents have communicated with Circle as it pertains to this investigation, and Circle has confirmed they are able to perform this act from **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**, pursuant to a seizure warrant. Tether can blocklist all USDT on deposit and also reissue the funds to case agents at a government-controlled wallet.

55. Case agents know that money launderers prefer to use Stable coins because they hold a consistent value. The majority of cryptocurrency has a value that is volatile, and criminals can lose money while the stolen funds are being transferred between addresses or being held in a cryptocurrency address such as the **subject account**. Since a Stable coin, such as USDC or USDT, will holds its value, Stable coins are the preferred choice by criminals and/or money launderers.

56. The **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** has been active since June 24, 2024 and has received 58 deposits worth approximately $6,057,631. As of September 11, 2024, the **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** holds the

following balance:

    a.  989.366377 Ether (ETH) valued at approximately $2,282,157.66 USD

    b.  1,468,397.990302 Tether (USDT) valued at approximately $1,459,370.59 USD

    c.  **812,526.6006 USD Coin (USDC) valued at approximately $817,513.16 USD**

57.    Case agents conducted further analysis of **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** and learned it has received $3,763,677 worth of cryptocurrency from Coinbase and other similar exchanges. Case agents know this reporting victim was directed to use Coinbase to purchase cryptocurrency and transfer it to the target(s)' address. Case agents know that the targets normally use the same method operation with respect to these fraudulent scams and often similarly direct their victims. As a result, case agents believe the cryptocurrency sent to the **subject account address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** from exchanges worth $3,763,677, are stolen funds from multiple victims.

## IDENTIFICATION OF ADDITIONAL VICTIMS

58.    Case agents were notified by Colleyville Police Detective/U.S. Secret Service Task Force Officer Jeffrey Prater located in Texas that a victim reported an investment scam to the local district attorney's office. The victim reported he invested $4,000 worth of cryptocurrency into the cflcoin investment. The victim was told he needed to investment $50,000, but he could only invest $4,000. The victim tried to cash-out after allegedly earning significant profits, but was unable to and realized it was a scam. This victim lost $4,000. At the time of this warrant, case agents have been unable to speak with the victim to learn additional details.

22

59. Case agents received information from Ed Burr, Senior Investigator from the Kansas Attorney General's Office. Investigator Burr reported that victim, R.D., in Kansas fell victim to the same clfcoin scam.

60. Case agents contacted R.D. via telephone. R.D. reported that he lives in Wamego, Kansas, United States. R.D. explained that in May of 2024 he responded to an add on Facebook that was titled something similar to "Millionaire Bootcamp." Upon joining this group, he was directed to communicate via Whatsapp with "John Harrison." He also communicated with "Bill Davis" and "Lisa Davis" on Whatsapp.

61. R.D. was taught by "John Harrison" how to invest in the crypto market. "John Harrison" seemed to be intelligent and trustworthy because his strategies and suggestions worked. R.D. trusted "John Harrison" and believed that he had R.D.'s best interest to guide him into successful trading strategies.

62. R.D. explained that "John Harrison" taught R.D. how to signup for and get a strike wallet. A strike wallet is an application you can download onto your desktop or mobile device. You can then deposit USD into that account from your bank account to purchase Bitcoin or other cryptocurrency types. After R.D. signed up for a wallet and purchased Bitcoin, "John Harrison" had R.D. send the bitcoin to fund R.D.'s clfcoin account. R.D. said he saw the funds in his clfcoin account and was able to trade within the account. After sometime, R.D. attempted to withdraw his profits but was unable to. He contacted "John Harrison" and was told that he needed to pay a "tax" or a "fee" to withdraw his funds. This is when he became suspicious and reported the issue to the FBI using the IC3 website. R.D. lost about $370,000.00 of his own money. R.D was unable to

23

provide transaction details at the time of applying for this warrant.

63.    Case agents noticed many similarities with the scam involving both R.D and S.M, including: (1) they both responded to a Facebook ad titled something similar to "Millionaire Bootcamp"; (2)) they both were redirected into Whatsapp to speak with "John Harrison"; (3) they were both instructed how to exchange USD for cryptocurrency, (4) they were both instructed to send that cryptocurrency to a specific virtual currency address, (5) they both used the same fraudulent clfcoin website, (6) they both believed they were trading the funds they deposited, and (7) they both attempted to withdraw the funds but were told an additional "fee" or "tax" was needed to be paid.  Although R.D. was told to purchase Bitcoin, Bitcoin can be swapped at anytime by the target(s) of this investigation and deposited into the **subject account** as USDC, USDT, or ETH.

## CONCLUSION

64.    Based on the facts and circumstances set forth in this affidavit, I submit that there exists probable cause to believe that all USDC held on deposit in **Ethereum Blockchain address 0x500e9b90b1310b8dcf3f82e03344e0da79694857** is:

a.  Funds traceable to, and are therefore proceeds of, a wire fraud offense or offenses committed in violation of 18 U.S.C. § 1343, and therefore subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

b.  Funds involved in, or traceable to funds involved in, money laundering offenses, committed in violation of 18 U.S.C. §§ 1956 and 1957, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981 (a)(1)(A) and 984, and subject to criminal forfeiture under 18 U.S.C. § 982(a)(1); and

c. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

25

## ATTACHMENT A

*Property to be Seized*

Pursuant to this warrant, Circle Internet Financial, LLC ("Circle") shall:

1. Immediately effectuate a freeze of the USDC associated with the following virtual currency address, which exists on the Ethereum blockchain:

   - **Ethereum blockchain address 0x500e9b90b1310b8dcf3f82e03344e0da79694857**

2. Immediately provide to the government the U.S. dollar equivalent of the USDC associated with the above-identified virtual currency address by sending the U.S. dollar equivalent to a government-controlled account. The details of the government-controlled account will be provided to Circle via separate cover.

Circle shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.

26